**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THERESA STEWART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No.** |
| | ) | |
| **THE HARTFORD INSURANCE** | ) | |
| **GROUP,** | ) | |
| | ) | |
| **Defendant.** | ) | **Jury Trial Demanded** |

## COMPLAINT

Plaintiff Theresa Stewart ("Stewart"), pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII), 42 U.S.C. § 1981 ("Section 1981"), and the Illinois Human Rights Act, 775 ILCS 5/1, *et seq.* ("IHRA"), complains of her former employer, defendant The Hartford Insurance Group ("The Hartford"), for sabotaging her career, for willfully exposing her to severe and perverse harassment at her job, and for constructively discharging her because of her race and in retaliation for complaining about The Hartford's discrimination, harassment and retaliation based on her race and her sex in violation of Title VII, Section 1981, and IHRA.

### JURISDICTION AND VENUE

1.      The Court has jurisdiction of this case pursuant to 42 U.S.C. § 1981; 42 U.S.C. § 2000e-5 ("Title VII"); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343 (civil rights); and 28 U.S.C. § 1367 (supplemental jurisdiction).

2.      Venue is proper in this district pursuant to 42 U.S.C. § 2000 ("Title VII"); and 28 U.S.C. § 1391(b)(1), (2) (venue generally), because the events leading to this action occurred here.

## PARTIES

3.      Stewart, an African American female, worked for The Hartford Insurance Group in its Aurora, Illinois, location from January 2015 to February 2019, and then as a remote worker located in Illinois from February 2019 until The Hartford constructively discharged her on May 10, 2021.

4.      The Hartford Financial Services Group, Inc., commonly known as The Hartford, is a United States-based investment and insurance company. The Hartford is a Fortune 500 company headquartered in its namesake city of Hartford, Connecticut and doing business in DuPage County, Illinois.

## PROCEDURAL HISTORY

5.      Stewart filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 3, 2021. Her charge was cross-filed with the Illinois Department of Human Rights ("IDHR"). A copy of the charge is attached to this complaint as Exhibit A.

6.      Stewart filed an amended charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 28, 2021. Her charge was cross-filed with the Illinois Department of Human Rights ("IDHR"). Exhibit B.

7.      The EEOC issued a Notice of Right to Sue on July 20, 2021. This Notice gave Stewart until October 18, 2021, to file a lawsuit in State or Federal Court. Exhibit C.

8.      Stewart and The Hartford entered into a "Tolling Agreement" on August 19, 2021. This Agreement extended the timeframe for filing a lawsuit to November 17, 2021. Exhibit D.

**Stewart's Initial Success At The Hartford**

9.      Stewart began her career with The Hartford as a Customer Service Representative in January of 2015.

10.     In June 2016, The Hartford promoted Stewart to Claim Representative Trainee in the Catastrophe Claims Operations Department, and then promoted her again in February 2019 to Claims Representative III in the Commercial Property Claims Department.

11.     Stewart was the only African American in the Commercial Property Claims Department. She excelled in this position and received regular accolades for her outstanding work.

12.     Director Carrie Gray encouraged Stewart to apply for the SOAR Program, which trains top performers and prepares them for career growth opportunities within the company, including management positions.

13.     On January 6, 2020, Stewart was assigned to Supervisor Tom Bethsold's team, where she was met with immediate hostility.

**Stewart Regularly Suffered Racism and Sexism by The Hartford**

14.     On Tom Bethsold's team, Stewart was the only African American employee, and she was the only employee of color within the Commercial Property Claims Department. Of forty-six Inside Claims Representatives, Stewart was the only African American.

15.     Stewart was yelled at and humiliated in front of team members and staff for voicing her opinion or asking questions in meetings, forced to constantly witness racist jokes and disparaging comments against the African American community, and denied opportunities for professional growth and advancement.

16.     In February 2020, Chris Nutter, a White male Claims Representative III, posted a picture of a house for sale in Oakland, California, on the group Huddleboard (an internal Internet page within The Hartford used for group forums). Nutter stated that he would not buy the house because it was located in a "ghetto" neighborhood and that he could not believe how expensive it was, considering the neighborhood is "ghetto." Instead of correcting Nutter, Bethsold enthusiastically agreed with the racist comment – specifically with Nutter's assessment that the neighborhood was a "ghetto." Remarkably, Nutter was promoted to a new role in the General Liability ("GL") Department after making these disparaging remarks about Blacks, and he returned to the CPC Department later that year as a temporary supervisor for the resource group known as SRG.

17.     In April 2020, Michelle Browne, a White female member of Stewart's team, posted memes of two Black celebrities, Lawrence Fishburne and Rihanna. Bethsold immediately commented that the images were "Negative!" Until that point in Stewart's time on the team, no one had posted images of Black individuals on the Huddleboard for "Morale Check," and Bethsold had not rejected or criticized any images of White celebrities posted on the Huddleboard.

18.     In the next few days, Bethsold posted a photo of the Black actor and producer Samuel L. Jackson and remarked that he prefers Samuel L. Jackson to Morgan Freeman---- another Black actor----because Jackson curses a lot in his movies. Bethsold had no reason to post images of the actor, make racist comparisons of the two Black male actors, or make degrading remarks regarding their professional acting careers.

19.     In June 2020, on a Skype conference call, Browne complained to the team about upcoming protests in Chicago regarding the murder of George Floyd by a White Minneapolis

4

Police Officer, stating that "they (Black people) will be out there rioting again." First, Browne had no reason to raise the issue of the protests because they had nothing to do with the team's work and did not directly impact her life as a non-resident of Chicago. Second, Browne's comments were disparaging because they refer to the Black community by the dehumanizing and monolithic "they," and predict that "they" will be "rioting" or causing property damage. Importantly, Rue was on the call and heard Browne's comment, yet he did not intervene in any way or direct Browne to temper her comments about the protests.

20.     In November 2020, Browne made another racist comment during a team huddle when Bethsold brought up the TV show "The Masked Singer." Browne commented that she "cannot stand some Black people like Wayne Brady (a contestant on the show) who can sing, dance, and act," because she could not do any of those things. Bethsold smirked as if he enjoyed Browne's remarks and did nothing to intervene.

## Hartford Abused Stewart, But Not Her White Counterparts

21.     In March 2020, Bethsold again berated Stewart in front of her team members during a team discussion regarding a claim handler within the Department who received a downgrade for a payment inaccuracy posted in the Department newsletter. Several team members had questions and comments including Stewart; however, when Stewart attempted to join the conversation and said she "replaces property with like kind and quality materials," she was yelled at and humiliated by Bethsold. He made several hostile comments toward Stewart, claiming, "That is not what the policy says!," "You are supposed to pick the lesser value!" and "Think about your bonus!" Bethsold's demeanor was akin to a rant, speaking in an uncontrolled, negative manner. Bethsold continued ranting and then commented, apropos to nothing, that "we should help people differently who live in Boise, Idaho." It is worth noting that Bethsold lives in

5

Boise, Idaho, which has a 90% White population. Needless to say, there is nothing stated in any of The Hartford's policies about assisting people differently if they live in Boise, Idaho. Further, per The Hartford's insurance policies, if the insured has replacement cost value, the Company is supposed to replace the insured's property with like kind and quality, as opposed to the lesser value. It is noteworthy that Rue was present at this meeting and sat there and watched Bethsold yell and humiliate Stewart in front of her team members.

22.     In March 2020, Bethsold berated Stewart in front of another colleague for assigning SIU (Special Investigations Unit) to a claim rather than sending a "Sworn Proof of Loss" ("SPOL") letter to the insured. SIU's investigation confirmed that the insured was indeed inflating his damages.

23.     Although Steward had followed protocol by assigning SIU when she suspected fraud, Bethsold became hostile and belittled Stewart, coaching and reprimanding her in front of Stephanie McCabe, a White woman in the Special Investigations Unit. In a hostile tone, Bethsold criticized Stewart for assigning SIU rather than sending a SPOL.

24.     Bethsold asked McCabe to review Stewart's SPOL letter before Stewart would be allowed to send it. Although company policy requires supervisors or higher to review an adjuster's letter, McCabe was not at a higher level than Stewart. Further, Stewart's SPOL letters were so detailed that a prior supervisor, Goodfield, had praised her drafting.

25.     In March of 2020, Bethsold and Rue refused to pay Stewart for overtime while assisting a customer. The customer was in the Pacific Time Zone, and had requested an appointment with Stewart at approximately 4:30 p.m. Central Time to discuss a million dollar claim. Goodfield had previously encouraged Stewart to stay late and accommodate customers

when necessary. Also, Bethsold had once told her that staying late was expected, and that she would be paid overtime. Instead, Bethsold unfairly admonished Stewart for "abusing" her time.

26.     Bethsold regularly downgraded Stewart's claim files for minor infractions to lower Stewart's compliance score. A lower compliance score limited her eligibility for promotions and transfers within the company.

    a.     In July 2020, Bethsold downgraded one of Stewart's claims for failure to obtain a lease agreement from the insured. Stewart explained to Bethsold that she did not need to obtain a lease agreement for that claim because the insured had a glass repair endorsement that provided coverage for the glass repair if the glass was in the insured's care, custody, and control. Stewart had discussed the exact coverage form with Goodfield, who had directed Stewart to waive the lease. Nevertheless, Bethsold downgraded the claim and said in an email that all the other supervisors agreed with the downgrade, "especially Cindy Goodfield" and Manager Rue.

    b.     In August of 2020, Bethsold downgraded one of Stewart's files for a $4.49 payment discrepancy, representing the remaining portion of the insured's deductible which Stewart had waived to promote good customer service. Goodfield's advice to Stewart to be "flexible" with customers and work with them appears in her 2019 Performance Review, a directive attributed to manager Rue. Bethsold criticized Stewart's claim handling despite the customer's positive loyalty survey and the insignificant amount of money waived, well within her settlement authority.

    c.     Bethsold's consistent downgrades negatively impacted Stewart's compliance scores, annual bonuses, and merit increases, which are primarily based on the metrics. Bethsold caused Stewart's compliance to average below the benchmark, but the

7

four White employees on Bethsold's team averaged well above benchmark. Stewart observed the files of two of her white counterparts and confirmed that they contained more mistakes than hers. For example, in November 2020, a supervisor and a senior claim representative sent an email to the department regarding substandard initial contact notes in the files of one her White colleagues.

      d.      Bethsold criticized Stewart's claims, despite her high claim handling standards relative to those of her teammates. She regularly received positive feedback from colleagues, including recognition from Property Major Case Adjusters, Special Investigative Unit personnel, Senior Claim Representatives, and previous supervisors. For example, on November 11, 2020, Stephanie Schneider, a member of the Cyber Team, recognized Stewart for how well she handled a Cyber Claim – a specialty claim for which Stewart had no formal training.

27.      Bethsold consistently belittled Stewart in front of her team. In September 2020, Bethsold told Stewart, in front of several colleagues, that her initial contact percentage was below the benchmark. Stewart accepted the suggestions to improve her numbers but raised the concern that because she was handling high influxes in claim volume compared to others who were not on regular intake, that it was not fair to wait until the end of the year and then compare her metrics to everyone in the Department. Stewart also told Bethsold that she felt that he did not support her or assist her when needed for claim issues that arose. Bethsold had no reason discuss Stewart's performance metrics in front of the entire team other than to embarrass her and to damage her reputation. He did not criticize any of the White team members about their performance.

28.     In November of 2020, Bethsold gave Stewart "coaching" regarding a straightforward email that she sent to Stacey Breckenridge, a White female who supervised Brenda Avelar, a White female Outside Claim Representative. Avelar had received a poor customer survey of which Bethsold and Breckenridge were aware, being automatically alerted to detractor surveys. Additionally, the customer also informed Stewart that he was unhappy with Avelar's communications about the claim. Stewart emailed the customer's comments to Breckenridge, relaying his request to speak with Avelar's supervisor. Bethsold accused Stewart of not fostering a "cohesive" relationship with Breckenridge because she relayed the customer's concerns in an email.

### Hartford Denied Stewart Professional Development Opportunities

29.     In February 2020, Stewart asked Bethsold, her direct supervisor, about professional development opportunities and advice on processing high intake in a team meeting. His remarkable response: "It's not my job to determine what your development should be!"

30.     Following the February 2020 team meeting, Stewart asked Bethsold if she could shadow Erica Carroll, one of the department's top performers. Bethsold said he would reach out to Carroll, but never did so. Later, Bethsold told her that he "forgot."

31.     In June 2020, Stewart applied for a "stretch assignment" to manage COVID-19 intake; she was one of the first employees in her department to respond. Rue denied Stewart the assignment, which would have been a significant opportunity for her professional development. Instead, Rue gave the assignment to three White employees, one of whom had significantly less experience than Stewart, was half her age, and had been with The Hartford for less than a year.

32.     In October of 2020, Stewart expressed interest in additional training on the Equipment Breakdown Specialty Team, for which she was qualified and had previously received

9

training. Although Stewart attended Equipment Breakdown Huddles, she was neither

acknowledged nor given any learning opportunities. On January 6, 2021, Rue announced that

Mike Kain, a White male Claim Representative III, would be joining that team, a higher paying

position for which Stewart was not allowed the opportunity even to apply. The first mention of

an opening was when Kain got the promotion.

### The Hartford Retaliated Against Stewart for her 2018 and 2020 Complaints

33.     In May 2020, Amy Vehslage, a team leader in the Catastrophe Claims Operations

Department (CCO), asked Stewart to follow up on a closed claim (from 2016) that she handled

when she worked in that Department. At that point, Stewart had not worked in the CCO

Department for eighteen months and felt that she was not sufficiently familiar with the current

procedures in that Department. Goodfield had previously informed her that she was not supposed

to handle CCO claims anymore, a directive from Director Carrie Gray. Stewart responded to

Vehslage's email, asking her to reassign the claim to someone within the CCO Department.

34.     The correspondence was forwarded to Bethsold and Rue, who immediately

scheduled two conference calls with Stewart to reprimand her for inappropriately managing her

time and workflow. During the first call, Bethsold yelled at Stewart the entire time and would not

allow her an opportunity to speak. During the second call with Rue and Bethsold, the two asked,

"what all happened in CCO when you worked there," referring to a sexual harassment complaint

that she had filed in 2018.

35.     Stewart was humiliated and perplexed because her sexual harassment complaint

was to have been kept confidential, was highly personal, and had nothing to do with the reason

for the conference call. Stewart replied that she had filed an internal complaint but did not wish

to discuss it. There was no reason to bring up the sexual harassment complaint other than to

intimidate Stewart, to signal that they had investigated her history at the Company and that they had spoken to people within the CCO Department about her confidential complaint.

36.    Bethsold also reprimanded Stewart in an email directly following the second conference call, saying, "you indicated that you overreacted to the situation." Stewart feels his comment was retaliation for her 2018 sexual harassment complaint.

37.    On November 30, 2020, Stewart submitted a twenty-six-page complaint to The Hartford's Employee Relations Department alleging race discrimination. Her complaint detailed at least eighteen specific incidents in which Bethsold, and Rue treated her less favorably than the White employees, and that she was subjected to a hostile work environment because of her race.

38.    On December 3 and December 9, 2020, Stewart met with Employee Relations Consultant Catrina Howell. Stewart specifically requested to be transferred to a new supervisor effective immediately and explained to Howell that the work environment on Bethsold's team was "not healthy" and had "impacted her mental health." Instead of honoring her request, The Hartford required Stewart to remain on Bethsold's team for five more weeks. Predictably, Bethsold and his team escalated their campaign to harass, intimidate, and alienate Stewart in retaliation for her complaint.

39.    For example, on December 31, 2020, Bethsold posted racist memes on the group Huddleboard to retaliate against Stewart for filing a complaint of harassment and race discrimination. Bethsold's post related to an incident posted on Twitter that same month, which went viral when bystanders took a video of a White man threatening and harassing a Black man and repeatedly calling him "Nigger!" In the video, the White man said to the Black man, "Fuck my mama Nigger, Fuck yo mama Nigger, Fuck yo mama, On God, I am not trying to disrespect you, I am going to say Nigger all day every day, Are you kidding me, Where you from Nigger,

11

Where the fuck you from, Get the fuck out of here, You a clown Nigger, On God you a clown

Nigger, Smack me Nigger!" The incident occurred at a Circle K convenience store in Elyria,

Ohio. After the White man attempted to kick the can of Twisted Tea (an alcoholic beverage) out

of the Black man's hand, the Black man hit the White man in the face with the can of Twisted

Tea.

40.     The video went viral on Twitter and was shared across social media and the

Internet, including YouTube, and has generated millions of views. Twisted Tea memes are racist

and violent, and there are thousands of similar memes created from the original viral video

posted on Twitter.

41.     Bethsold posted racist memes under "Celebrations" on the Huddleboard about the

Elyria Video. The first part of the meme featured the Black rapper, T-Pain, and this Twisted Tea

meme had the heading, "T Pain vs Tea pain." There was a second meme of Frodo Baggins, a

White protagonist in the movie *Lord of the Rings*, with the caption, "'ITS OVER." In the film,

the scene occurred at Mount Doom, and there had been a struggle between Frodo and Gollum,

wherein Gollum loses his balance and falls with The Ring into the fiery Cracks of Doom.

42.     The memes that depicted racial violence and the White movie character

proclaiming "ITS OVER" were targeted towards Stewart in retaliation her November 30, 2020

complaint, citing racism on Bethsold's team and within the Department. Bethsold posted the

memes under "Celebrations" in continuation of his racial harassment, and to threaten Stewart and

demonstrate that he had "prevailed." Stewart feared for her safety and security at work.

43.     Shortly after Bethsold posted his racist memes, The Hartford Employee Relations

sent Stewart an email during the New Year's holiday weekend, stating that the investigation into

her claim was complete.

44.     On January 5, 2021, Stewart met again with Howell, who said that The Hartford had completed its investigation into her complaints of harassment and racial discrimination and was "unable to find any illegal conduct or violation of company policies." Stewart was requested to follow up with Assistant Vice President Dimitrius King---one of the few Black members of leadership who has since left the Company---regarding reassigning her to the team of Brian Heppner, a White male claim supervisor.

45.     On January 6, 2021, after meeting with Howell and King the previous day, Stewart was also asked to meet with Gray to discuss reassigning her to Heppner's team. After this fifth conference call with management discussing the matter, Gray began sending Stewart invites for further meetings. Stewart felt that she was being treated as if she was the individual accused of wrongdoing and needed to be constantly monitored. The continued meetings exacerbated Stewart's already severe emotional distress, which she suffered because of The Hartford's hostile work environment. Further, no one gave her any indication that management would take any remedial actions in response to her complaint. Stewart therefore declined further invitations to meet with management.

46.     Effective January 6, 2021, Stewart was transferred to Heppner's team. Bethsold and Heppner grew up together, worked together prior to their joining The Hartford, and are close personal friends outside of the office.

47.     After Stewart was transferred, Bethsold was assigned as the Supervisor of Senior Claim Representative Reassignments. In his new capacity, Bethsold continued to discriminate against Stewart by declining to reassign her complex claims to a Senior Claim Representative per the Department's protocol.

13

48.     Stewart was the only African American employee on Heppner's team. During a one-on-one meeting with Stewart, Heppner asked how the transition to his team was going, compared to Bethsold's. Assuming he was talking about the work, Stewart replied that it was "straightforward." Heppner then commented that his all-White team had "accepted her as if she were one of their own," which Stewart believed to be a reference to her status as the only African American employee on the team.

**Stewart Suffered Severe Emotional Distress From The Hartford's Toxic Environment**

49.     Conditions at The Hartford had become so intolerable for Stewart that she had to request a medical leave of absence from February 15, 2021, to May 9, 2021.

50.     Stewart suffered from debilitating anxiety; she could not sleep or put the constant harassment out of her mind. She suffered tension headaches, difficulty concentrating, and forgetfulness to the point where daily tasks became challenging.

51.     During her medical leave, Stewart sought treatment from by her doctor for work-induced stress on February 22, 2021. Her treatment included antidepressant medication.

52.     Stewart is currently working with a psychiatrist for continued treatment for Post-Traumatic Stress Disorder caused by her mistreatment at The Hartford.

**Count 1 – Title VII**
**Race Discrimination – Terms and Conditions of Employment**

53.     Paragraphs 1 through 52 are incorporated by reference.

54.     Title VII prohibits an employer from discriminating against an employee in the terms and conditions of her employment because of her race. 42 U.S.C. § 2000e-2.

55.     The Hartford was Stewart's employer and Stewart was The Hartford's employee, within the meaning of Title VII. 42 U.S.C. § 2000e.

14

56.     The Hartford discriminated against Stewart because of her race by denying her opportunities for training and advancement.

57.     The Hartford's discrimination against Stewart violated Title VII.

58.     As the direct result of The Hartford's violation of Title VII, Stewart suffered injury in the form of lost compensation and advancement in her career.

## Count 2 – Title VII
### Race Discrimination – Hostile Environment

59.     Paragraphs 1 through 52 are incorporated by reference.

60.     Title VII prohibits an employer from discriminating against an employee because of her race by maintaining a hostile environment in the workplace. 42 U.S.C. § 2000e-2.

61.     The Hartford was Stewart's employer and Stewart was The Hartford's employee, within the meaning of Title VII. 42 U.S.C. § 2000e.

62.     The Hartford consistently subjected Stewart to a hostile environment because of her race.

63.     The Hartford's hostile environment towards Stewart took the form of harassment and racist comments from her supervisor and fellow employees, in person and online on Huddleboard, and in the form of unwarranted downgrading and criticism of her client files.

64.     The hostile environment suffered by Stewart was ongoing, severe and pervasive.

65.     The Hartford's hostile environment violated Title VII.

66.     The Hartford's violation of Title VII was willful.

67.     As the direct result of The Hartford's violation of Title VII, Stewart suffered and will continue to suffer injury in the form of severe emotional distress and humiliation.

15

### Count 3 – Title VII
### Retaliation Based On Race – Hostile Environment

68.     Paragraphs 1 through 52 are incorporated by reference.

69.     Title VII prohibits an employer from retaliating against an employee because she complained about illegal discrimination in the workplace. 42 U.S.C. § 2000e-3.

70.     The Hartford was Stewart's employer and Stewart was The Hartford's employee, within the meaning of Title VII. 42 U.S.C. § 2000e.

71.     The Hartford retaliated against Stewart because of her complaints about its racial discrimination and its hostile environment based on race.

72.     The Hartford's retaliation violated Title VII.

73.     The Hartford's violation of Title VII was willful.

74.     As direct result of The Hartford's violation of Title VII, Stewart suffered and will continue to suffer injury in the form of severe emotional distress and humiliation.

### Count 4 – Title VII
### Race Discrimination/Retaliation – Constructive Discharge

75.     Paragraphs 1 through 52 are incorporated by reference.

76.     Title VII prohibits an employer from discriminating against an employee because of her race by maintaining a hostile environment in the workplace. 42 U.S.C. § 2000e-2.

77.     Title VII also prohibits an employer from retaliating against an employee because she complained about illegal discrimination in the workplace. 42 U.S.C. § 2000e-3.

78.     The Hartford violated Title VII by discriminating against Stewart because of her race and by retaliating against her for complaining about its race discrimination.

79.     The harassment and retaliation of Stewart by The Hartford's management was egregious and objectively unbearable, making conditions so intolerable that any reasonable person in her situation would resign.

80.     The Hartford's violation of Title VII caused the constructive discharge of Stewart's employment.

81.     As the direct result of her constructive discharge, Stewart suffered and will continue to suffer severe emotional distress, the loss of compensation and benefits, as well as damage to her career.

### Count 5 – Section 1981
### Race Discrimination – Terms and Conditions of Employment

82.     Paragraphs 1 through 52 are incorporated by reference.

83.     Section 1981 provides that every person in the United States has the same right to make and enforce contracts, including a contract of employment, as is enjoyed by white citizens.

84.     Section 1981 prohibits an employer from discriminating against an employee in the terms and conditions of her employment because of her race.

85.     The Hartford discriminated against Stewart because of her race by denying her opportunities for training and advancement.

86.     The Hartford's discrimination against Stewart violated Section 1981.

87.     The Hartford's violation of Section 1981 was willful.

88.     As the direct result of The Hartford's violation of Section 1981, Stewart suffered injury in the form of lost compensation and advancement in her career.

### Count 6 – Section 1981
### Race Discrimination – Hostile Environment

89.     Paragraphs 1 through 52 are incorporated by reference.

90.     Section 1981 provides that every person in the United States has the same right to make and enforce contracts, including a contract of employment, as is enjoyed by white citizens.

91.     Section 1981 prohibits an employer from discriminating against an employee because of her race by maintaining a hostile environment in the workplace.

92.     The Hartford consistently subjected Stewart to a hostile environment because of her race.

93.     The Hartford's hostile environment towards Stewart from her supervisor and fellow employees took the form of harassment and racist comments in person and online on Huddleboard, and in the form of unwarranted downgrading and criticism of her client files.

94.     The hostile environment suffered by Stewart was ongoing, severe and pervasive.

95.     The Hartford's hostile environment violated Section 1981.

96.     The Hartford's violation of Section 1981 was willful.

97.     As the direct result of The Hartford's violation of Section 1981, Stewart suffered and will continue to suffer injury in the form of severe emotional distress and humiliation.

### Count 7 – Section 1981
### Retaliation Based On Race – Hostile Environment

98.     Paragraphs 1 through 52 are incorporated by reference.

99.     Section 1981 provides that every person in the United States has the same right to make and enforce contracts, including a contract of employment, as is enjoyed by white citizens.

100.    Section 1981 prohibits an employer from discriminating against an employee because of her race by maintaining a hostile environment in the workplace.

101.    The Hartford retaliated against Stewart because of her complaints about its racial discrimination and its hostile environment based on race.

18

102. The Hartford's retaliation violated Section 1981.

103. The Hartford's violation of Section 1981 was willful.

104. As the direct result of The Hartford's violation of Section 1981, Stewart suffered and will continue to suffer injury in the form of severe emotional distress and humiliation.

### Count 8 – Section 1981
### Race Discrimination/Retaliation – Constructive Discharge

105. Paragraphs 1 through 52 are incorporated by reference.

106. Section 1981 provides that every person in the United States has the same right to make and enforce contracts, including a contract of employment, as is enjoyed by white citizens.

107. Section 1981 prohibits an employer from discriminating against an employee because of her race by maintaining a hostile environment in the workplace.

108. Section 1981 also prohibits an employer from retaliating against an employee because she complained about illegal discrimination in the workplace.

109. The Hartford violated Section 1981 by discriminating against Stewart because of her race and by retaliating against her for complaining about its race discrimination.

110. The harassment and retaliation of Stewart by The Hartford's management was egregious and objectively unbearable, making conditions so intolerable that any reasonable person in her situation would resign.

111. The Hartford's violation of Section 1981 caused the constructive discharge of Stewart's employment.

112. As the direct result of her constructive discharge, Stewart suffered and will continue to suffer severe emotional distress, the loss of compensation and benefits, as well as damage to her career.

## Count 9 – IHRA
### Race Discrimination – Terms and Conditions of Employment

113.    Paragraphs 1 through 52 are incorporated by reference.

114.    The IHRA prohibits an employer from discriminating against an employee in the terms and conditions of her employment because of her race.

115.    The Hartford was Stewart's employer and Stewart was The Hartford's employee, within the meaning of the IHRA

116.    The Hartford discriminated against Stewart because of her race by denying her opportunities for training and advancement.

117.    The Hartford's discrimination against Stewart violated the IHRA

118.    As the direct result of The Hartford's violation of the IHRA, Stewart suffered injury in the form of lost compensation and advancement in her career.

## Count 10 – IHRA
### Race Discrimination – Hostile Environment

119.    Paragraphs 1 through 52 are incorporated by reference.

120.    The IHRA prohibits an employer from discriminating against an employee because of her race by maintaining a hostile environment in the workplace.

121.    The Hartford was Stewart's employer and Stewart was The Hartford's employee, within the meaning of the IHRA.

122.    The Hartford consistently subjected Stewart to a hostile environment because of her race.

123.    The Hartford's hostile environment towards Stewart took the form of harassment and racist comments from her supervisor and fellow employees in person and online on Huddleboard, and in in the form of unwarranted downgrading and criticism of her client files.

20

124.    The hostile environment suffered by Stewart was ongoing, severe and pervasive.

125.    The Hartford's hostile environment violated the IHRA.

126.    The Hartford's violation of the IHRA was willful.

127.    As the direct result of The Hartford's violation of the IHRA, Stewart suffered and will continue to suffer injury in the form of severe emotional distress and humiliation.

### Count 11 – IHRA
### Race Discrimination – Retaliation

128.    Paragraphs 1 through 52 are incorporated by reference.

129.    The IHRA prohibits an employer from retaliating against an employee because she complained about illegal discrimination in the workplace. 775 ILCS 5/6-101.

130.    The Hartford was Stewart's employer, and Stewart was The Hartford's Employee, within the meaning of IHRA 775 ILCS 5/2-101.

131.    The Hartford retaliated against Stewart because of her complaints about discrimination and about hostile environment in the workplace.

132.    The Hartford's retaliation took the form of harassment and racist comments, in person and online on Huddleboard, from her supervisor and fellow employees and unwarranted downgrading and criticism of her client files.

133.    The Hartford's retaliation against Stewart violated the IHRA.

134.    The Hartford's violation of IHRA was ongoing and willful.

135.    As a direct result of The Hartford's violation of IHRA, Stewart suffered and will continue to suffer injury in the form of lost compensation, emotional distress and humiliation.

### Count 12 - IHRA
### Constructive Discharge

136.    Paragraphs 1 through 52 are incorporated by reference.

21

137.    The IHRA prohibits an employer from discriminating against an employee in the terms and conditions of her employment because of her race. 775 ILCS 5/2-102.

138.    The IHRA prohibits an employer from discriminating against an employee because of her race by maintaining a hostile environment in the workplace. 775 ILCS 5/2-102.

139.    The IHRA prohibits an employer from retaliating against an employee because she complained about illegal discrimination in the workplace. 775 ILCS 5/6-101.

140.    The Hartford subjected Stewart to discrimination, a hostile environment, and retaliation, in violation of the IHRA.

141.    The Hartford's discrimination, hostile environment and retaliation were subjectively and objectively unbearable to Stewart, making conditions so intolerable that any reasonable person in her situation would resign.

142.    The Hartford's willful violation of the IHRA forced Stewart to leave her job.

143.    The Hartford's actions were willful and malicious and constituted a reckless indifference to Plaintiff' rights under the Illinois Human Rights Act.

144.    As a result of the acts complained herein, Stewart has suffered and will continue to suffer severe emotional distress and mental anguish, loss of compensation as well as damage to her career.

### Count 13 – Title VII
### Retaliation Based On Sex – Hostile Environment

145.    Paragraphs 1 through 52 are incorporated by reference.

146.    Title VII prohibits an employer from retaliating against an employee because she complained about illegal discrimination in the workplace. 42 U.S.C. § 2000e-3.

147. The Hartford was Stewart's employer and Stewart was The Hartford's employee, within the meaning of Title VII. 42 U.S.C. § 2000e.

148. The Hartford retaliated against Stewart because of her complaints about its hostile environment based on sex.

149. The Hartford's retaliation violated Title VII.

150. The Hartford's violation of Title VII was willful.

151. As direct result of The Hartford's violation of Title VII, Stewart suffered and will continue to suffer injury in the form of severe emotional distress and humiliation.

### Count 14 – Title VII
### Retaliation Based On Sex – Constructive Discharge

152. Paragraphs 1 through 52 are incorporated by reference.

153. Title VII prohibits an employer from retaliating against an employee because she complained about sexual harassment in the workplace. 42 U.S.C. § 2000e-3.

154. The Hartford violated Title VII by retaliating against Stewart because she complained about The Hartford's hostile environment based on sex.

155. The harassment and retaliation of Stewart by The Hartford's management was egregious and objectively unbearable, making conditions so intolerable that any reasonable person in her situation would resign.

156. The Hartford's violation of Title VII caused the constructive discharge of Stewart's employment.

157. As the direct result of her constructive discharge, Stewart suffered and will continue to suffer severe emotional distress, the loss of compensation and benefits, as well as damage to her career.

23

## Count 15 – IHRA
### Retaliation Based On Sex – Hostile Environment

158.    Paragraphs 1 through 52 are incorporated by reference.

159.    The IHRA prohibits an employer from retaliating against an employee because she complained about illegal discrimination in the workplace. 775 ILCS 5/6-101.

160.    The Hartford was Stewart's employer and Stewart was The Hartford's employee, within the meaning of the IHRA.

161.    The Hartford retaliated against Stewart because of her complaints about its hostile environment based on sex.

162.    The Hartford's retaliation violated the IHRA.

163.    The Hartford's violation of the IHRA.

164.    As direct result of The Hartford's violation of the IHRA, Stewart suffered and will continue to suffer injury in the form of severe emotional distress and humiliation.

## Count 16 – IHRA
### Retaliation Based On Sex – Constructive Discharge

165.    Paragraphs 1 through 52 are incorporated by reference.

166.    The IHRA prohibits an employer from retaliating against an employee because she complained about sexual harassment in the workplace. 775 ILCS 5/6-101.

167.    The Hartford violated The IHRA by retaliating against Stewart because she complained about The Hartford's hostile environment based on sex.

168.    The harassment and retaliation of Stewart by The Hartford's management was egregious and objectively unbearable, making conditions so intolerable that any reasonable person in her situation would resign.

24

169.    The Hartford's violation of the IHRA caused the constructive discharge of Stewart's employment.

170.    As the direct result of her constructive discharge, Stewart suffered and will continue to suffer severe emotional distress, the loss of compensation and benefits, as well as damage to her career.

Wherefore, plaintiff Theresa Stewart requests judgment in her favor and against defendant The Hartford Insurance Group, awarding her:

A.      Damages for lost compensation in the form of backpay and front pay for a reasonable time in the future;

B.      Damages for emotional distress, humiliation, pain and suffering;

C.      Punitive Damages;

D.      Attorneys' Fees;

E.      The costs of this action; and

F.      Such additional relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

*s/ Dennis R. Favaro*
One of Plaintiff's Attorneys

Dennis R. Favaro  ARDC #6193849
*dfavaro@favarogorman.com*
Patrick J. Gorman  ARDC #6185111
*pgorman@favarogorman.com*
Andrew H. Haber ARDC #6198412
*ahaber@favarogorman.com*
Favaro & Gorman, Ltd.
9510 Turnberry Trail
Lakewood, Illinois 60014
(815) 477-1110